IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

THOMAS REYNOLDS                                                                    PLAINTIFF

V.                                           NO. 09-5182

MICHAEL J. ASTRUE,
Commissioner of Social Security                                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Thomas Reynolds, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for Supplemental Security Income (SSI) benefits under Title XVI of the Act. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff filed his application for SSI on April 3, 2007, alleging disability since May 31, 2006. (Tr. 104-106). A hearing was held before an Administrative Law Judge (ALJ) on December 11, 2008, where Plaintiff, Plaintiff's son, and a Vocational Expert (VE) appeared and testified. (Tr. 16-42). On April 27, 2009, the ALJ entered his decision, denying Plaintiff's request for SSI benefits. (Tr. 49-61). The ALJ found that Plaintiff suffered from the severe impairment of epilepsy. (Tr. 54). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and concluded that Plaintiff had the residual functional capacity (RFC) to: lift

and/or carry 50 pounds occasionally and 20 pounds frequently; sit 2 hours at one time; sit 6 hours in an 8-hour workday; stand 1 hour at a time; stand 4 hours in an 8-hour workday; walk 1 hour at a time; and walk 4 hours in an 8 hour workday. In addition, the ALJ found that the Plaintiff could engage in frequent use of his hands and feet; that he could occasionally climb and crawl, and that he could frequently balance, stoop, kneel and crouch. Further, the ALJ found that the Plaintiff could never work at unprotected heights or operate a motor vehicle; that he could occasionally work around moving mechanical parts, in humidity/wetness, around dust, odors, fumes and pulmonary irritants, in extreme cold/heat; occasionally work with vibrations; and that he could tolerate moderate exposure to noise. (Tr. 56). He found that Plaintiff would not be able to perform his past relevant work. However, with the assistance of the VE, the ALJ concluded that Plaintiff would be able to perform such jobs as charge account clerk or new account interviewer, office clerk, and production worker, bench assembly. (Tr. 60-61). Plaintiff's request for review was denied by the Appeals Council on July 24, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 3-7).

**Evidence Presented**

Plaintiff began having epileptic seizures in 1981. (Tr. 225). On February 16, 1998, Plaintiff was admitted to Baptist Medical Center, under the supervision of Dr. Victor Biton, for a continuous EEG video monitoring to determine his potential candidacy for epilepsy surgery as part of the treatment for his intractable[1] epilepsy. (Tr. 225). At that time, Plaintiff described two types of seizures that he experienced. During one type, he would start with a feeling like he was about to have a seizure, would feel "it coming on," and had a sensation of "de ja vue." He

---

[1] Intractable - Resistant to cure, relief, or control. Dorland's Illustrated Medical Dictionary 967 (31st ed. 2007).

would then start sweating profusely, have chills and feel confused.  He could hear people talk around him, but could not understand what they said or respond to them.  (Tr. 225).  His hand would start to fidget, which would last from a few minutes to 15 minutes.  Once the seizure was over, he would feel confused and disoriented for a few more minutes.  (Tr. 225).  During the second type of seizure, Plaintiff would fall down, tense up, his eyes would roll back, and he would begin having rhythmic jerking.  On many occasions, he would bite his tongue.  This seizure would last for a few minutes, but it would take him up to 1 and ½ hours to fully recover from this type.  (Tr. 225-26).  According to Dr. Biton's report, Plaintiff had tried various medications, was allergic to Dilantin, and while he was on Tegretol, there was a behavioral change, and he became aggressive.  Phenobarbitol did not seem to control his seizures and also caused some aggressive behavior.  He tried Depakote, which did not control his seizures, and later, Neurontin was added, which did not seem to help.  Later, Klonopin was added.  At the conclusion of the EEG monitoring, which lasted four days, it was determined that the recording was borderline, due to a very slight impression of rare occurrence of left temporal slowing.  (Tr. 234).  No definite epileptiform activity was identified and no ictal events were captured.

     On March 1, 1998, Plaintiff was admitted to the Baptist Medical Center for a second EEG video monitoring, after he experienced two generalized tonic-clonic seizures.  (Tr. 243).  Unlike the previous recording, the findings of the second recording indicated focal encephalopathic process involving the temporal areas, the left greater than the right, and a structural abnormality to the area was considered epileptiform activity.  (Tr. 253).  The recording

AO72A
(Rev. 8/82)

was found to support the clinical diagnosis of epilepsy, most probably of the focal type.[2]  (Tr. 268).  Plaintiff was started on Lamictal.  (Tr. 253).

In 1999 and 2000, Plaintiff presented himself to Dr. Charles Stinnett at Siloam Springs Medical Center.  (Tr. 273-274, 339-340).  Plaintiff was taking Tegretol during this time, and in 2000, was taking 400 mg. in the morning and 200 mg. in the evening.  He was reported as having been seizure free "for a long period of time now" and the impression was "Seizure disorder doing quite well."  (Tr. 273).

A record dated July 31, 2003, from Barbara Wesner, RN, at St. Francis Clinic indicates "Seizure Disorder" and notes that Plaintiff was on 600 mg. of Tegretol and needed:

> the Doctor to call Susan @ Dr. Ewarl's office and make arrangements for pt. to get Rx from the manufacturer.  Has meds for 7 wks. needs lab - Has not had lab for 2-3 yrs. Dr. Charles Stinnett is primary physician Last seizure Feb. 1998.

On September 22, 2005, Plaintiff was admitted to Siloam Springs Memorial Hospital, and the admitting diagnosis was "seizure/combative behavior."  At that time, it was reported that Plaintiff was not taking any medications and refused medications.  (Tr. 299).  Plaintiff was reported as "extremely combative on arrival requiring 10 staff members to control."  (Tr. 306).  Plaintiff was reported as biting a paramedic prior to arrival.  (Tr. 306).  During the course of the evaluation, Plaintiff required significant amounts of medications to sedate him in order for testing to be done.  (Tr. 306).  A CT of Plaintiff's head was taken, and it was found that there was some ventricular asymmetry with the left lateral ventricle being generally smaller than the right.  (Tr. 331).  Plaintiff was released from the hospital to his family on September 23, 2005,

---

[2]Focal Epilepsy - Epilepsy consisting of focal seizures.  Id. at 640.
Focal seizure - partial seizure - Id. at 1713.

and was told not to drive. Plaintiff also refused medications.

On October 7, 2005, Plaintiff again presented to Siloam Springs Memorial Hospital. He was reported as mowing at a golf course, when he started to seize, and ran the lawnmower off of an embankment into a creek. When EMS arrived, Plaintiff was actively seizing, with full body involvement. (Tr. 277). Plaintiff was reported as not taking seizure medicines, but was instead taking an "herbal" remedy for seizures. (T. 279).

On October 10, 2005, Plaintiff presented himself to Dr. R. Dale Clemens, his treating physician, at the Community Physicians Group. (Tr. 337). His chief complaint was that he had two seizures since his last visit. Plaintiff was reported as having problems with some medication and went "for some time without having grand mal seizures." (Tr. 337). Dr. Clemens reported that Plaintiff needed a neurology evaluation. (Tr. 337). He advised Plaintiff to start Tegretal twice a day. (Tr. 337).

On April 28, 2006, Plaintiff presented to Siloam Springs Memorial Hospital, having had another seizure. He reported noncompliance with his medications, because he was unable to afford them, and they "don't work well anyway." (Tr. 284, 286, 352-53)

On May 30, 2007, Dr. Clemens completed a Seizure Disorder Questionnaire. (Tr. 417-418). Dr. Clemens indicated that Plaintiff had epileptic episodes during daytime and possibly the nighttime. He stated that Plaintiff had a history of petit mal seizures, but that the more recent symptoms were suggestive of partial complex seizures. (Tr. 417). Dr. Clemens concluded that: Plaintiff could not safely drive; had a history of minimal injury during seizure and memory problems; that Plaintiff's symptoms were severe enough to interfere with attention and concentration; that Plaintiff would sometimes need to take unscheduled breaks during an 8 hour

work shift; that Plaintiff's impairments were likely to produce "good days" and "bad days;" that Plaintiff would average being absent from work more than two days per month; that Plaintiff could tolerate frequent exposure to marked temperature changes and exposure to noise; that Plaintiff could occasionally tolerate exposure to dust, fumes and gases; and that Plaintiff could "not at all" tolerate exposure to unprotected heights, being around moving machinery, and driving automotive equipment. (Tr. 418). On that same date, Dr. Clemens reported that Plaintiff brought disability papers to the office and that Plaintiff went for a period of time between 2002 to 2005 without seizures. He noted that the seizures recurred around August of 2005, and seemed to happen every two to six weeks. (Tr. 420). He reported that Plaintiff had significant periods of post ictal[3] time, up to 36 hours of confusion, with no significant injuries. He stated that Plaintiff was not then on any medications, and that the last medication he took was Tegretol timed release. (Tr. 420). He was prescribed 200 mg. of Tegretol at that time. (Tr. 421).

A Physical RFC Assessment was completed on June 18, 2007. In the Assessment, the physician reported that no exertional, manipulative, visual or communicative limitations were established. (Tr. 410-413). He also reported that Plaintiff could frequently climb ramps/stairs; balance, stoop, kneel, crouch, and crawl; could never climb ladders/ropes/scaffolds; and that Plaintiff's seizure disorder would preclude work at heights. (Tr. 411). With respect to environmental limitations, the physician found that Plaintiff could have unlimited exposure to extreme cold and extreme heat; wetness; humidity; noise; vibration; fumes; odors; dusts; gases; and poor ventilation, but should avoid all exposure to hazards (machinery, heights, etc.). (Tr. 413). The physician noted that medical records provided by Plaintiff during a period of time

---

[3]Ictal - pertaining to, characterized by, or caused by a stroke or an acute epileptic seizure. Id. at 924.

from 1996 through 2001 indicated that Plaintiff was taking Tegretol for seizure control and was basically seizure free. He also reported that the available medical information supported the diagnosis and history of seizure disorder, but did not support a level of severity sufficient to preclude all work activity. (Tr. 413).

On August 6, 2007, in Plaintiff's Disability Report - Appeal, Plaintiff stated that his seizures had increased to more than one per week. He also stated that the Tegretol he was taking for seizure control caused tiredness, irritability, and restlessness. (Tr. 169). In another disability report and a function report dated September 11, 2007, Plaintiff stated that he suffered from the side effects of depression, impotence and poor coordination from Tegretol, and that his condition affected his understanding, memory, following instructions, concentration and talking. (Tr. 174, 180).

On September 13, 2007, Plaintiff's ex-wife completed a statement for the Social Security Administration, wherein she stated that she had seen well over 150 attacks or more since 1981 and that the last time she saw him have an attack was March of 2007. (Tr. 193). She stated that the past year she had noticed Plaintiff's memory was getting very bad - both short term and long term. (Tr. 193). She also stated that in the past month, she was aware of him having four or five seizures. (Tr. 194).

Plaintiff's son also completed a statement for the Social Security Administration on September 13, 2007, stating that he had seen Plaintiff have convulsions and blackouts probably 100 times or more. (Tr. 195). The son stated that Plaintiff had four seizures in the past month and that Plaintiff told him that if he did not take the medications, it was usually because of financial reasons. (Tr. 196).

On September 14, 2007, Plaintiff completed a statement for the Social Security Administration, stating that he had four seizures in the past month and thirty to thirty-five in the past year. (Tr. 192). He stated that he took Tegretol XR - 200 mg, for the attacks, which was prescribed by Dr. Clemens when he saw him on September 13, 2007. (Tr. 192). A statement by Plaintiff's ex-boss was also completed on September 18, 2007, wherein the ex-boss stated that he had seen Plaintiff have six or more seizures, the last one occurring in May of 2006. (Tr. 197).

On April 11, 2008, Vicki H. Moore, an APN at St. Francis Clinic, reported that Plaintiff needed a refill for Tegretol, as he had two seizures in March. (Tr. 449). She noted that Tegretol worked best and that Plaintiff did not want to change dosage or increase the dosage at that time. (Tr. 449). Ms. Moore reported that she discussed the need to increase Tegretol to "therapeutic range 800 mg." and that was refused. Plaintiff saw Ms. Moore again on August 11, 2008, for a routine visit for a medicine refill. He reported having no problems with Tegretol. (Tr. 447). He stated that he had problems with his long-term memory. (Tr. 447). He stated that he had been on dual medications such as Neurontin, had seen a neurologist, and the medicines had been adjusted many times without improvement. (Tr. 447). The "Plan" set forth in Ms. Moore's record reflected that the "tegretol level is > $100.00 pt. cannot afford" and that "pt not wanting to change anything without Dr. Clemens involvement." (Tr. 447).

On August 28, 2008, Dr. C.R. Magness conducted a General Physical Examination of Plaintiff. (Tr. 429-434). The diagnosis was: "Epilepsy; seizure medication intolerant; smokeless tobacco use; borderline HBP - situational depression." (Tr. 433). Dr. Magness found that there were no restrictions with Plaintiff's upper and lower extremities; that Plaintiff had good mental facilities; that he had poorly controlled epilepsy; and that Plaintiff was unemployable due to his

medical history. (Tr. 433). Dr. Magness completed a Medical Source Statement of Ability to do Work-Related Activities (physical), stating that frequent periods of rest in low stress situations were best with seizure disorders, and that Plaintiff had 20 years of "failed domestic situation due to medication intolerance and seizure management at home." (Tr. 217, 221).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC). See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**Discussion**

The ALJ found that Plaintiff had the RFC to perform certain work. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, the claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). The ALJ concluded that when Plaintiff was compliant with his medications/treatment, he would not experience seizures. The ALJ relied primarily upon the fact that medical records from 2000 until July 2003 showed that Plaintiff had been on Tegretol and had been seizure free since 1998,

-10-

AO72A
(Rev. 8/82)

and that there was no evidence that Plaintiff complained of recurring seizures until September 22, 2005, when Plaintiff was hospitalized at Siloam Springs Memorial Hospital after suffering a seizure.

With regard to Plaintiff's failure to take his medications, there is no question that Plaintiff failed to take Tegretol consistently. The question is why did Plaintiff fail to take the Tegretol consistently and refuse to increase the dosage in 2008. There are numerous records indicating that Plaintiff was intolerant of many of the anti-seizure medications that were prescribed. Although the records indicate that Tegretol was the most effective medication, they also reflect that in 1998, while on Tegretol, there was a behavioral change, and Plaintiff became aggressive, and the drug was discontinued. Further, Plaintiff reported on several occasions that he was unable to afford the Tegretol. The ALJ relied upon the fact that records from Plaintiff's hospitalization in September of 2005 showed that he tested positive for Tetrahydrocannabinol, and the ALJ stated that "[a]pparently the claimant was able to purchase cannabis." (Tr. 58).

The Eighth Circuit has held that if a claimant is unable to follow a prescribed regimen of medication and therapy to combat his disabilities because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992). The Eighth Circuit has also held that a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be "an independent basis for finding justifiable cause for noncompliance [with prescribed treatment]," Brown v. Barnhart, 390 F.3d 535, 540(8th Cir.2004), quoting from Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984).

Although there were times when Plaintiff was recorded as not taking any medications,

-11-

there were also many times that Plaintiff was taking some dosage of Tegretol. There is nothing in the records before the Court to indicate that Plaintiff had access to free samples of Tegretol or had medical insurance coverage during the relevant time frame. In fact, the record reflects that Plaintiff did not have insurance coverage. The fact that Plaintiff may have tested positive for cannabis in 2005 does not, in and of itself, dilute Plaintiff's position that he was not able to afford Tegretol, which, according to one of the medical records, cost $100 for the prescription. (Tr. 447). There is no indication that the ALJ inquired as to whether the cannabis was purchased by Plaintiff or given to him. Therefore, there may be any number of justifiable reasons Plaintiff failed to take the medication: because it caused behavioral changes - i.e., made him aggressive; because Dr. Clemens was not consulted; because he could not afford it; because he tried it in the past and it did not help; or because, as Dr. Magness noted, he was "seizure medication intolerant." In any event, the fact that Plaintiff's seizures seemed to be under control between 2000 until 2005, while taking up to 600 mg. of Tegretol, does not necessarily mean that three years later, the same dosage would be as effective.

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995); Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000). This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512. The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The Court is of the opinion that the ALJ failed to fully develop the record regarding the reasons Plaintiff did not always comply with prescribed medical treatment, some or all of which could be justified.

The ALJ also stated that although Dr. Clemens "referred him for a neurological evaluation" there was no evidence that Plaintiff saw one. In a medical record dated August 11, 2008, Vicki Moore, APN, reported that Plaintiff had seen a neurologist. However, the ALJ did not inquire of Plaintiff at the hearing, or of Plaintiff's treating physician, Dr. Clemens, by interrogatories, about any such visit, nor did the ALJ request the records from the neurologist. Upon remand, the ALJ should inquire about this further. If records from a neurologist can not be produced, the ALJ should direct Plaintiff to be examined by a neurologist, and request a physical RFC assessment from the neurologist.

The ALJ gave little weight to Dr. Clemens, Plaintiff's treating physician, who, in 2007, found Plaintiff's symptoms were severe enough to interfere with his attention and concentration; that Plaintiff would sometimes need to take unscheduled breaks during an 8 hour work shift; and would require him being absent from work more than two days per month. The ALJ discredited Dr. Clemens because he had not seen Plaintiff in approximately a year and a half at the time he completed his form. The ALJ gave "greater weight" to the opinion of Dr. Magness, a consultative examiner. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010) quoting Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). Although Dr. Clemens had not seen Plaintiff between October of 2005 and May of 2007, his opinion is supported by Plaintiff's hospital visit in 2006 for treatment of seizures, and is not inconsistent with the other evidence presented to the ALJ. Further, even Dr. Magness, although finding that Plaintiff could lift/carry/stand/sit at certain levels, went on to state that Plaintiff was "seizure

AO72A
(Rev. 8/82)

medication intolerant" and "Unemployable - due to medical history." (Tr. 433). These appear to be inconsistent statements by Dr. Magness, and the Court believes that both Dr. Clemens and Dr. Magness raised questions about Plaintiff's ability to function in the workplace, and that the ALJ should inquire further from both of these physicians and then re-evaluate his position.

The Court finds that the ALJ failed to fully develop the record and, accordingly, there is not substantial evidence to support his findings. Upon remand, the ALJ should:

1. Inquire as to the existence and availability of a neurologist's records and if none exist, have a neurologist examine Plaintiff and submit a Physical RFC Assessment;

2. Obtain additional information as to why Plaintiff was non-compliant with his prescribed medications;

3. Obtain a Physical RFC Assessment from Plaintiff's treating physician, Dr. Clemens and submit interrogatories to Dr. Magness relating to his inconsistent statements.

**Conclusion**

Based upon the foregoing, the undersigned reverses the decision of the ALJ and remands this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

IT IS SO ORDERED this 2nd day of November, 2010.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE